MR. JUSTICE WEBER,
dissenting:
I respectfully dissent from the conclusion of the majority that the District Court did not err by instructing the jury *334 that defendants were negligent as a matter of law. I conclude that the District Court improperly became a trier of disputed fact.
In finding both defendants negligent as a matter of law, the District Court based its decision first on res ipsa loquitur and secondly on negligence per se, arising from the violation of the safety code. The majority has not affirmed either theory. The majority did not consider the res ipsa loquitur theory. With regard to negligence per se, the majority concluded only that “violation of the code is evidence of negligence rather than negligence per se.” I agree with that determination. Upon that basis, the determination of negligence as a matter of law should be reversed.
The majority correctly points out that a case should be withdrawn from the jury only where there are no genuine and material issues of fact about which twelve reasonable people could disagree. The majority then briefly analyzes the evidence and concludes that defendant Mueller failed to come forward with evidence to show that the defendants exercised due care. I do not find that the record supports this conclusion.
Sharon Stephens, the building manager for Mueller, testified at length. Otis Elevator had the contract for maintenance of the elevator. Sharon had authority to call Otis to make repairs. She summarized her authority and duties as follows:
“A. General safety and traffic precautions as making sure that all outer doors on all floors were closed so that the elevator could operate.
“Q. Did you ever look for any other problems with the elevator?
“A. Yes, did. I rode it constantly.
“Q. Could you ascertain whether there was a problem in terms of function of the motor?
“A. I could by listening.
“Q. Did you know what those problems were exactly?
“A. No, I am not an engineer. Just it is simply that I could *335 ascertain something was not running as it should.”
If something went wrong, Sharon called Otis. She testified no complaints were made during the 15 days prior to the accident.
“Q. Turning your attention to August, 1981, from the 5th day of August, 1981, until the 20th day of August, 1981, were you ever notified or made aware of any problem whatsoever with the elevator at the Mueller Apartments? . . .
“A. I was given no notification that the elevator wasn’t working perfectly.
“Q. Were you living at the Mueller Apartments at that time?
“A. I was.
“Q. Did you use the elevator on a daily basis?
“A. I did.”
With regard to her use of the elevator during the 24 hours preceding the accident, Sharon testified:
“Q. Turning your attention to the 19th day of August, 1981, did you use the elevator on that day?
“A. Yes, I did.
“Q. Was that during the daytime?
“A. During the daytime and also in the evening.
“Q. What was the occasion for your using that elevator that evening?
“A. There was a very bad electrical storm with wind and lots of rain. All of the west hallway windows were open because it had been a hot day. I went to all floors and closed all those windows.
“Q. Did you use the elevator to go from floor to floor?
“A. I did.
“Q. Did your use of the elevator at that time take you to the lobby?
“A. It did.”
Sharon testified she had resided at the apartment from July 1979 to August 1981, the date of the accident. She testified that Otis maintained the elevator in excellent condition. When there was a problem, she summoned Otis. It was *336 her responsibility to make certain the elevator was not abused by tenants which included not letting the tenants slam the doors. When the doors were slammed, the users were immediately admonished; and the slamming of doors took place on rare occasions. With regard to the care and maintenance of the elevator, Sharon further testified:
“Q. With regard to the elevator operation itself, I assume that you had some discussions with the Otis Elevator people when you made calls and they came to the elevator on emergency calls, did you not?
“A. Yes.
“Q. According to the records that have been provided to us, there were at least 10 emergency calls in 1981 up until the date of the accident.
“A. Surely.
“Q. And then there were routine visits by the Otis Elevator Company.
“A. Correct.
“Q. Did you yourself ever ask anyone from Otis Elevator what, if anything, you should look for to see, to make sure the elevator was in good working condition?
“A. I don’t believe I ever did.
“Q. Did you ever receive any instructions from Mr. Sprague (an employee of Otis) relative to the operation of the elevator?
“A. Yes.
“Q. What was that?
“A. Well the general checking, you know, of locks, or listening in case the motor lugged down, ran slow.
“Q. Anything else?
“A. Checking it for leveling.
“Q. Is that it?
“A. There may have been more. I don’t recall anything right now.”
With regard to the operation of the elevator itself, Sharon testified it worked well:
“Q. With regard to the elevator trouble, how would you *337 characterize the overall operation of the elevator with regard to whether it was working or not?
“A. Overall it operated very well.”
Sharon also testified at length with regard to the maintenance of the elevator by the named representatives of Otis. She pointed out that she was more than satisfied with their work. The repairmen resided in Butte and responded immediately. Sharon had no trouble with the assistance which Otis gave to keep the elevator in good condition. Sharon also testified that after the plaintiff’s fall, she looked at the elevator and the hook on the elevator door and saw that the hook was bent.
The defendants presented additional evidence which showed that the elevator had been well maintained and was in good working condition. All of that evidence taken together rebuts the majority’s conclusion that the defendant failed to come forward with any evidence showing due care and failed to rebut the evidence of negligence. My review of the evidence suggests that the following findings can be made from the evidence submitted by the defendants:
(1) That the building manager had lived in the building for two years and constantly rode the elevator; that she rode the elevator a number of times on the day of the accident and observed nothing wrong; that no complaints of any type had been made to her about the defective operation of the elevator; and that the elevator was in good operating condition on the date of the accident.
(2) That the building manager was given the obligation to see that the elevator was properly functioning and was given authority to call Otis in the event of any defects of operation; that she was aware of the problem which could occur from slamming of the elevator doors and posted signs and also admonished elevator users not to slam the doors, so that slamming was a rare happening.
(3) That the building manager was in constant contact with the Otis Elevator people, who immediately responded to requests for repair assistance and did an excellent job of *338 repair, so far as the manager could determine; that there had been a total of ten emergency calls to Otis in 1981 prior to the August 20th accident; that the Otis repairman inspected the elevator on August 4, 1981; and there had been no complaints from that time to the date of the accident.
This evidence clearly raises an issue of fact as to whether the defendants acted as reasonable men exercising due care under the circumstances. The jury should have been allowed to perform its function as the trier of fact. The jury should have weighed the evidence of due care on the part of the defendants, the evidence of negligence arising from the violation of the elevator code, and the remainder of the evidence. Thereafter, the jury should have determined whether or not the defendants were negligent. That issue of disputed fact was improperly resolved by the District Court.
The majority sets a standard of “highest degree of care” for the operation of an elevator, and points out that the elevator is performing the function of a common carrier. Those conclusions are based on authority which I find unpersuasive - a 1925 Alabama Supreme Court decision and a 1970 Illinois intermediate appellate court decision. Such conclusions may have been appropriate in earlier years when the rule of contributory negligence might have barred any recovery by a plaintiff, such as the plaintiff in this case. I do not believe such a rule is necessary any longer for the protection of elevator users in Montana. The rule of comparative negligence applies. The jury is eminently capable of comparing the negligence on the part of the building owner, the elevator maintainer and the user.
I would reverse the judgment and remand for new trial as to both defendants Mueller Apartments and Otis Elevator Company.